2006 UT App 259

**STATE of Utah, in the interest of T.W., a person under eighteen years of age.**

**T.W., Appellant,**

v.

**State of Utah, Appellee.**

**No. 20050129–CA.**

Court of Appeals of Utah.

June 22, 2006.

Dee W. Smith, Ogden, for Appellant.

Mark L. Shurtleff, Atty. Gen. and Marian Decker, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before BILLINGS, J., GREENWOOD, Associate P.J., and THORNE, J.

OPINION

BILLINGS, Judge:

¶ 1 Juvenile T.W. appeals from the juvenile court's order of restitution following an adjudication for unlawful sexual activity with a minor, a class B misdemeanor if committed by a defendant "less than four years older than the minor at the time the sexual activity occurred." *See* Utah Code Ann. § 76–5–401 (2003). We affirm.

## BACKGROUND

¶ 2 On July 2, 2002, two sixteen-year-old juveniles, T.W. and R.Z., engaged in unlawful sexual activity, including "vaginal, anal[,] and oral sex," with fourteen-year-old K.C. Sometime that night, K.C.'s father called K.C.'s friend and discovered that K.C. was with R.Z. and T.W. When K.C. arrived home between 12:30 a.m. and 1:30 a.m., "[s]he was very emotional"—"she was crying[ and] having problems." K.C.'s father asked K.C. what was wrong, but K.C. said she could not tell him.

¶ 3 Because K.C. refused to speak with her father, he decided to take her to a counselor that she had seen before in the hope that she might speak to someone about the cause of her distress. The next morning, K.C.'s father, unaware of K.C.'s sexual encounter the previous night, took K.C. to Life–Line, a treatment center for troubled teens. K.C. had previously spent ten months at Life–Line and "graduated" from the center in March 2002.

¶ 4 Upon arriving at the center, K.C. met with James Smith, the counselor she had worked with during her prior stay at Life–Line. Smith testified that he believed K.C. was at the center because "she was having difficulty with her parents, following rules in the home." Smith also testified that "there was some threat to run away from home and it was clear that she was distraught, depressed[, and] angry."

¶ 5 After further discussions with K.C. during the first day or two of her arrival at Life–Line, Smith learned of K.C.'s sexual encounter with T.W. and R.Z. Smith recommended that K.C. get a morning-after pill and receive testing for sexually transmitted diseases. K.C. remained at Life–Line for approximately two and one-half months. According to Smith, K.C.'s extended stay at Life–Line was "ninety-eight percent" related to her sexual encounter with T.W. and R.Z. Smith also maintained that the reasons for K.C.'s prior stay were unrelated to the reasons for her second stay at Life–Line.

¶ 6 T.W. was ultimately charged with unlawful sexual activity with a minor and unlawful possession of alcohol by a minor. Pursuant to a plea agreement, T.W. admitted to unlawful sexual activity with a minor and the alcohol charge was dismissed. The juvenile court ordered T.W. to pay a fine and to complete the Victim Awareness Program, restricted all contact between T.W. and K.C. and/or R.Z., and ordered T.W. "to pay restitution in an amount determined by the probation department." At the request of K.C.'s father, and absent an objection from T.W., the case was transferred from Weber County to Davis County for final disposition of the restitution issue. Judge Van Dyke found that K.C.'s father was a victim entitled to restitution and ordered T.W. to pay restitution in the amount of $2486.24—one-half of the cost of K.C.'s stay at Life–Line. T.W. timely appeals the restitution order.

## ISSUES AND STANDARDS OF REVIEW

¶ 7 T.W. argues that because K.C.'s father is not a victim, the juvenile court erred when it ordered T.W. to pay restitution to K.C.'s father for the post-offense counseling that K.C. received at Life–Line. Although we "will not disturb a trial court's restitution order unless it exceeds that prescribed by law or [the trial court] otherwise abused its discretion ... we review a trial court's interpretation of restitution statutes for correctness." *State v. Bickley*, 2002 UT App 342, ¶ 5, 60 P.3d 582 (quotations and citations omitted).

¶ 8 T.W. further argues that even if we determine that K.C.'s father is in fact a victim, restitution would still be inappropriate because K.C.'s father could not recover damages in a civil suit against T.W. Specifically, T.W. asserts that K.C.'s father could not establish that K.C.'s counseling was a direct result of T.W. and R.Z.'s sexual offense. And, in a related argument, T.W. asserts that the juvenile court erred when it did not allow him to question Smith regarding specific reasons for K.C.'s stay at Life–Line. "The existence of a privilege is a question of law for the court," and we therefore review the juvenile court's finding of privilege for correctness. *State v. Anderson*, 972 P.2d 86, 88 (Utah Ct.App.1998) (quotations and citation omitted).

## ANALYSIS

■ ¶ 9 In determining that K.C.'s father is entitled to restitution, the juvenile court found that K.C.'s father is a victim under Utah Code section 76–3–201 (the Sentencing Statute). *See* Utah Code Ann. § 76–3–201(1)(e)(i) (2003). T.W. asserts that the juvenile court erred in applying the Sentencing Statute's definition of victim to K.C.'s father and, instead, should have applied the definition of victim as found in the Victims' Rights Statute and the Rights of Crime Victims Act. *See* Utah Code Ann. §§ 77–37–2(3) (2003), 77–38–2(9) (2003). Although T.W. argued before the juvenile court that K.C.'s father was not a victim entitled to restitution, he never argued that the definition of victim in the Victims' Rights Statute and the Rights of Crime Victims Act was more appropriate. Therefore, this argument was not preserved for appeal, and we do not address it.

■ ¶ 10 We find that the juvenile court correctly applied the Sentencing Statute's definition of victim to K.C.'s father. The Sentencing Statute defines victim as "any person who the court determines has suffered pecuniary damages as a result of the defendant's criminal activities." Utah Code Ann. § 76–3–201(1)(e)(i). As K.C.'s father was obligated to pay for K.C.'s treatment, it is clear that the father is "any person" within this definition. *See id.*

■ ¶ 11 T.W. further argues that K.C.'s father could not recover in a civil action arising out of T.W.'s unlawful sexual activities because K.C.'s therapy was not directly related to T.W.'s sexual offense. In support of his argument, T.W. asserts that the juvenile court improperly limited the testimony of K.C.'s counselor, James Smith, thereby making it impossible for the court to determine what role, if any, T.W. and R.Z.'s sexual offense played in K.C.'s need for therapy.

■ ¶ 12 In determining whether it was proper for the juvenile court to limit Smith's testimony, we recognize that Utah courts have "substantial discretion in conducting sentencing hearings." *State v. Patience*, 944 P.2d 381, 389 (Utah Ct.App.1997). In its discretion, a court can properly limit, or even disallow, a cross-examination during sentencing "so long as the defendant has the opportunity to refute the evidence presented or challenge its reliability." *Id.* at 389 n. 12.

■ ¶ 13 T.W. admits that he was allowed to cross-examine Smith. However, T.W. argues that he did not have the opportunity to challenge Smith's testimony because the juvenile court improperly limited his testimony under rule 506 of the Utah Rules of Evidence. *See* Utah R. Evid. 506. "Rule 506 cloaks in privilege confidential communications between a patient and her therapist in matters regarding treatment." *State v. Blake*, 2002 UT 113, ¶ 18, 63 P.3d 56. But the privilege afforded to communications between therapists and patients is not absolute. *See State v. Cardall*, 1999 UT 51, ¶ 29, 982 P.2d 79; *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) ("Although we recognize that the public interest in protecting this type of sensitive information is strong, we do not agree that this interest necessarily prevents disclosure in all circumstances."). When the patient's physical, mental, or emotional condition "is an element of any claim or defense," no privilege exists. Utah R. Evid. 506(d)(1); *Cardall*, 1999 UT 51 at ¶ 29, 982 P.2d 79. T.W. argues that the exception to rule 506 applies in this case because K.C.'s emotional condition is material and relevant to making a finding that K.C.'s counseling at Life–Line was related to her sexual encounter with R.Z. and T.W. We disagree.

■ ¶ 14 In *Cardall*, the Utah Supreme Court enunciated a test for determining whether an exception to rule 506 applies. *See* 1999 UT 51 at ¶ 29, 982 P.2d 79. This test was further clarified in *Blake*. *See* 2002 UT 113 at ¶ 18, 63 P.3d 56. Under this test, disclosure of protected material is "limited and require[s] a showing 'with reasonable certainty that [the privileged records contain] exculpatory evidence ... which would be favorable to [a] defense.' " *Id.* at ¶ 19 (quoting *Cardall*, 1999 UT 51 at ¶ 30, 982 P.2d 79). According to the court, this test is "a stringent test, necessarily requiring some type of extrinsic indication that the evidence within the records exists and will, in fact, be exculpatory." *Id.*

¶ 15 Although the court acknowledged that it cannot provide a precise definition of "reasonable certainty" as used in this test, it provided some guidance and stated that "mere speculation" that such evidence exists is not enough. *Id.* at ¶¶ 20–21. Instead, "[a]t a minimum, specific facts must be alleged." *Id.* at ¶ 22. These facts could include "references to records of only certain counseling sessions, which are alleged to be relevant, independent allegations made by others that a victim has recanted, or extrinsic evidence of some disorder that might lead to uncertainty regarding a victim's trustworthiness." *Id.* The court acknowledged that "[t]he difficulty in meeting this test is deliberate and prudent in light of the sensitivity of these types of records." *Id.* at ¶ 19. It is only when a defendant has overcome this high hurdle and identified this type of reasonably certain extrinsic evidence, that the court can "conduct an in camera review" of the privileged documents to determine whether the evidence is material. *Id.* at ¶ 23 (emphasis omitted); *see also State v. Gonzales,* 2005 UT 72, ¶ 44, 125 P.3d 878 (holding that defense counsel's authority to examine a victim's mental health records "depended on approval of the trial court following an in camera review").

¶ 16 In juvenile court, T.W. did not present evidence sufficient to meet the "reasonable certainty" requirement set forth in *Blake. See* 2002 UT 113 at ¶ 19, 63 P.3d 56. T.W. argued that K.C.'s records and communications with Smith would establish that her second stay at Life–Line was not directly related to T.W. and R.Z.'s sexual offense. However, T.W. never identified any specific post-offense counseling sessions—supported by extrinsic evidence—that were directly related to K.C.'s previous stay at Life–Line. Therefore, T.W. failed to meet the reasonable certainty test that would entitle him to an in camera review of K.C.'s records.

¶ 17 Finally, the juvenile court, in its discretion, allowed Smith to testify at the restitution hearing. At the hearing, Smith generally discussed what he believed were the reasons for K.C.'s second stay at Life–Line. According to Smith, "ninety-eight percent" of K.C.'s second stay at Life–Line was related to T.W. and R.Z.'s sexual offense. Based upon this testimony and other evidence heard at the restitution hearing, we conclude that the juvenile court did not abuse its discretion in finding that K.C.'s second stay at Life–Line was directly related to the sexual encounter. Therefore, K.C.'s father could recover damages in a civil action against T.W.

## CONCLUSION

¶ 18 Under the Sentencing Statute, we conclude that K.C.'s father is a victim for purposes of restitution. Moreover, K.C.'s father could prevail in a civil suit against T.W. because the juvenile court's factual findings support the conclusion that K.C.'s post-offense counseling was directly related to T.W. and R.Z.'s sexual offense.

¶ 19 Therefore, we affirm.

¶ 20 I CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge.

THORNE, Judge (concurring in the result):

¶ 21 I concur in the result reached by the majority opinion, but I am troubled by its decision that K.C.'s father D.C. is a victim for restitution purposes merely because he has a parental obligation to pay for K.C.'s treatment. By statute, D.C. can only be deemed a victim of T.W.'s crime if *he* "could recover against [T.W.] in a civil action." Utah Code Ann. § 76–3–201(1)(c), (e)(i) (2003). The majority opinion fails to identify any cause of action that would support D.C.'s victim status in this case. Instead, it appears to silently rely upon Utah Code section 78–11–6, the statute cited by the State below and to this court at oral argument as a basis for T.W.'s civil liability to D.C.[1] *See id.* § 78–11–6 (Supp.2005). I see serious poten-

---

1. An alternative interpretation of the majority opinion's decision in this regard is that parents are automatically entitled to restitution for expenses arising out of crimes against their children, without regard to their children's partic-

ipation in those crimes. While this may or may not represent good policy, it would be up to the legislature to expand the statutory definition of victims in such a manner.

tial flaws in such a usage of section 78–11–6, but I concur in the result in this case because T.W. did not preserve these issues for appeal.

¶ 22 Assuming that T.W.'s crime created a cause of action in favor of K.C., K.C. could recover her counseling and treatment expenses as special damages in a civil suit against T.W. This would ordinarily render her a victim for restitution purposes, and entitle her to restitution for those expenses as a component of T.W.'s sentence. *See id.* § 76–3–201(1)(c), (e)(1). However, T.W. presented evidence that K.C. consented to and voluntarily participated in T.W.'s criminal activities, arguably precluding K.C. from receiving restitution under an exception to the statutory definition of "victim." *Id.* § 76–3–201(1)(e)(ii) (excluding co-participants in a defendant's criminal activities from the definition of victims eligible for restitution). To sidestep this potential problem, the State asked the juvenile court to apply Utah Code section 78–11–6, popularly known as a wrongful death or wrongful injury statute, to allow D.C. to recover restitution in place of K.C. *See id.* § 78–11–6; *see also id.* § 76–3–201(1)(c), (e)(i) (defining "victim" for restitution purposes as one who could recover special damages in a civil action). The juvenile court, and now this court, allowed restitution to D.C. with no analysis of how section 78–11–6 renders D.C. a victim in this case.

¶ 23 I see several legal obstacles to this approach. First, any suit by D.C. against T.W. under Utah Code section 78–11–6 would be derivative of a cause of action belonging to K.C. *See id.* § 78–11–6 (establishing a parent or guardian's cause of action "for the death or injury of a minor child when the injury or death is caused by the wrongful act or neglect of another"); *see also Dowling v. Bullen,* 2004 UT 50, ¶ 14, 94 P.3d 915 (characterizing a wrongful death claim as a derivative claim); *Jensen v. IHC Hosps., Inc.,* 944 P.2d 327, 332 (Utah 1997) (same). Victim status for restitution purposes is determined solely by civil liability. Assuming that K.C. has a cause of action against T.W. but cannot be deemed a victim for restitution purposes due

to her participation in T.W.'s crime, I am not at all certain that D.C. can be deemed a victim when his cause of action against T.W. would be entirely derivative of K.C.'s. *See* Utah Code Ann. § 76–3–201(1)(c), (e).

¶ 24 Additionally, a lawsuit for wrongful injury requires an underlying theory of civil liability, and the State has failed to identify any specific theory, i.e., an actionable "wrongful act or neglect" on the part of T.W., that might support civil liability in favor of D.C. *Id.* § 78–11–6. The State's alleged theory of recovery below, in its entirety, was that "D.C. is statutorily entitled to sue for the injury to K.C. (UCA 78–11–6) by the 'wrongful act or neglect of another'." [2] This bare reference to section 78–11–6, with no underlying theory of civil liability, does not state a cause of action. *See Jensen,* 944 P.2d at 332 ("[A] wrongful death cause of action is based on the underlying wrong done to the decedent[.]"); *cf. Barrett v. Superior Court,* 222 Cal.App.3d 1176, 272 Cal.Rptr. 304, 306 n. 1 (1990) ("[P]laintiffs' cause of action for wrongful death, which is stated in a separate count, is not a proper count, because it does not amount to a different legal theory of the nature of defendants' wrongful act." (quotations omitted)); *Ward v. Greene,* 267 Conn. 539, 839 A.2d 1259, 1265 (2004) (requiring wrongful death plaintiffs to "allege an underlying theory of legal fault"). By failing to allege an underlying theory of civil liability, such as battery or negligence, that would support a wrongful injury lawsuit by D.C. against T.W., the State fails to even state a cause of action that could support a finding that D.C. was a victim in this matter.

¶ 25 Further, any cause of action supporting D.C.'s victim status must be *completely* established by T.W.'s admission in order to allow restitution. *See State v. Houston,* 2000 UT App 242, ¶ 13 & nn. 2–3, 9 P.3d 188 (explaining that a restitution court may not look beyond the facts and circumstances established by the conviction or admission and that a defendant is entitled to a civil jury trial on any remaining fact question bearing on liability); *State v. Robinson,* 860 P.2d 979, 983 (Utah Ct.App.1993) ("Restitution should

---

**2.** This single citation to section 78–11–6 is the only reference to that section by either of the

parties or the juvenile court in the entire record on appeal.

be ordered only in cases where liability is clear as a matter of law and where commission of the crime clearly establishes causality of the injury or damages."). T.W. admitted to having sexual intercourse with fourteen-year-old K.C., nothing more and nothing less. Even assuming that these facts make out a prima facie showing of wrongful injury liability to D.C. on some unidentified tort theory,[3] K.C.'s consent and participation in T.W.'s crime is a contested issue that bears on T.W.'s liability and is not disestablished by his plea. *See Houston*, 2000 UT App 242 at ¶ 13 & n. 3, 9 P.3d 188 (holding that lack of consent, if not established by a defendant's conviction or admission, is a jury question precluding restitution).

¶ 26 K.C.'s alleged consent[4] to and participation in T.W.'s actions would seem to either preclude or severely limit any wrongful injury action by D.C. against T.W., whether based on an intentional tort or negligence. *See Jensen*, 944 P.2d at 332 ("[A] wrongful death cause of action ... may only proceed subject to at least some of the defenses[, including comparative negligence,] that would have been available against the dece-

dent had she lived to maintain her own action."). A parent in D.C.'s position could attempt to assert strict liability against T.W. for his violation of section 76-5-401, but private causes of action are not generally implied in criminal statutes. *See Youren v. Tintic Sch. Dist.*, 2004 UT App 33, ¶ 4, 86 P.3d 771 ("When a statute makes certain acts unlawful and provides criminal penalties for such acts, but does not specifically provide for a private right of action, we generally will not create such a private right of action."). In any event, a wrongful death claim may not be premised on a strict liability violation. *See Adkins v. Uncle Bart's, Inc.*, 2000 UT 14, ¶¶ 36-37, 1 P.3d 528 (holding that the wrongful death statute is fault-based and cannot merge with a strict liability offense to create a cause of action). Thus, it appears that T.W. was entitled to a separate civil trial to argue the issue of K.C.'s consent and obtain whatever relief from liability that consent might provide.

¶ 27 The juvenile court did not address any of these potential bars to D.C.'s restitution because T.W. did not raise them. T.W. nev-

---

3. Arguably, the juvenile court should have identified on the record the theory of liability that it was employing. *See* Utah Code Ann. § 77-38a-302(3) (Supp.2005) ("If the court determines that restitution is appropriate or inappropriate under this part, the court shall make the reasons for the decision part of the court record."); *see also State v. Smith*, 2003 UT App 179, ¶ 30, 72 P.3d 692 (remanding a restitution matter for further consideration because the trial court order did not "explain its rationale for the amount ordered" or "disclose the reasoning underlying its decision"). T.W. argues as much in his appellate brief, stating that the juvenile court was required to find a theory of civil liability in favor of D.C. and determine that such liability was established by the facts of the case. However, T.W. never complained below that the juvenile court inadequately explained its reasoning, and thus failed to preserve any error for appeal. *See id.* at ¶¶ 27-28 (finding preservation of issue of trial court's lack of record findings where defendant objected to omission of reasoning *after* court issued restitution order). *But see State v. Weeks*, 2002 UT 98, ¶¶ 22-25 & n. 11, 61 P.3d 1000 (suggesting that it would be plain error for court to completely fail to address the reasons for its restitution decision); *Monson v. Carver*, 928 P.2d 1017, 1028-29 (Utah 1996) (remanding for explanation of statutory factors in restitution order although defendant did not object to order below).

If T.W. had preserved this issue, the remedy would not be the vacation of the restitution order as T.W. requests, but rather a remand for the juvenile court to place its reasons for ordering restitution on the record. *See Smith*, 2003 UT App 179 at ¶ 30, 72 P.3d 692 ("Thus, we remand this issue to the trial court for reconsideration of its restitution order and the entry of findings supporting whatever amount is eventually assessed against Smith."); *see also Monson*, 928 P.2d at 1028. Of course, T.W. would then be free to bring any alleged legal flaws in the court's reasoning to its attention, and to further appeal any alleged errors that he would thus preserve.

4. The State argues that fourteen-year-old K.C. could not consent to sexual intercourse for civil liability purposes as a matter of law. While I do not flatly reject this contention, I do note the lack of Utah caselaw deciding this question, and that there is authority suggesting that sex with a fourteen-year-old is not deemed forcible, i.e., without consent, solely as a result of the minor's age. *See* Utah Code Ann. § 76-5-406(9) (2003) (establishing that sex with those *under* the age of fourteen is without consent as a matter of law); *State v. Salazar*, 2005 UT App 241, ¶ 9, 114 P.3d 1170 (holding that lack of consent outside of the circumstances listed in section 76-5-406 is a fact question). *But see* Utah Code Ann. § 76-5-401 (2003) (criminalizing sexual activity with fourteen-year-olds without regard to consent).

er argued that the ban on co-participant restitution necessarily bans restitution to one whose cause of action against the defendant is derivative of a co-participant's cause of action. He never moved to dismiss the restitution hearing on the grounds that the State had not asserted a theory of liability, nor did he request that the juvenile court or the State identify such a theory. Finally, while the juvenile court noted that T.W. had generally preserved the issue of whether K.C.'s alleged voluntary participation in his crime "excuses the restitution obligation," T.W. never specifically informed the juvenile court that he sought to use K.C.'s participation as a defense to D.C.'s claim for restitution, nor did he present any legal theory to the court as to why such a defense might be meritorious. In sum, T.W. allowed the State to lead the juvenile court down a path that is potentially fraught with error, and he cannot now complain that the juvenile court took that path.[5] *See State v. Richins*, 2004 UT App 36, ¶ 8, 86 P.3d 759 ("In order to preserve an issue for appeal, it 'must be raised in a timely fashion, must be specifically raised such that the issue is sufficiently raised to a level of

consciousness before the trial court, and must be supported by evidence or relevant legal authority.'" (quoting *State v. Schultz*, 2002 UT App 366, ¶ 19, 58 P.3d 879)).

¶ 28 Thus, while I see no cause for reversal, I would hold merely that T.W. has not identified any preserved error in the proceedings below and affirm the juvenile court on that basis. The majority opinion's implicit reliance on section 78–11–6 in these circumstances represents a substantial departure from existing law that could ultimately have broad implications for both criminal and civil use of wrongful death or injury claims. For the reasons expressed above, I cannot join in the majority opinion, and I urge those who would rely upon our decision today to consider whether other provisions of the law might affect the result in any particular future case.

---

5. It is, of course, true that "an overlooked or abandoned argument should not compel an erroneous result[ and that we] should not be forced to ignore the law just because the parties have not raised or pursued obvious arguments." *Kaiserman Assocs., Inc. v. Francis Town*, 977 P.2d 462, 464 (Utah 1998). Here, however, I cannot say that the result is clearly erroneous under existing law. I can only say that there are undecided issues of Utah law that might have invalidated the result below, had T.W. raised them and had we decided them in his favor.